UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARIA ALVARADO,

Plaintiff,

DECISION AND ORDER

02-CV-6569L

v.

JOANNE B. BARNHART,
Commissioner of Social Security,

Defendant.

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("the Commissioner") that plaintiff Maria Alvarado is not disabled under the Social Security Act and, therefore, is not entitled to supplemental security income ("SSI") benefits.

Both the Commissioner and plaintiff have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons discussed below, the Commissioner's motion is granted, plaintiff's motion is denied, and the complaint is dismissed.

## PROCEDURAL BACKGROUND

Plaintiff was born on December 29, 1952. (T. 92). She has an eighth-grade education and no past relevant work experience. (T. 20).

Plaintiff has filed three applications for SSI benefits, on February 20, 1997, July 27, 1998, and January 15, 1999, all of which have been denied. After the third application was denied upon reconsideration on February 15, 2000, plaintiff requested a hearing. A hearing was held on August 23, 2001, and the ALJ issued a decision on November 15, 2001, finding that plaintiff was not disabled and denying her application. The ALJ's decision became the final decision of the Commissioner on September 18, 2002, when the Appeals Council denied plaintiff's request for review. (T. 8-9). This action followed.

## DISCUSSION

### I. Definition of Disability

Under the Social Security Act ("the Act"), a person is considered disabled when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ... ." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). A physical or mental impairment (or combination of impairments) is disabling if it is of such severity that a person "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ... ." *Id.* at §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a person is disabled within the meaning of the Act, the ALJ proceeds through a five-step sequential evaluation. *Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986); *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). The Second Circuit has described the five-step process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in

> 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Tejada*, 167 F.3d at 774.

## II. The ALJ's Decision

Applying the five-step disability evaluation, the ALJ first found that plaintiff had not engaged in substantial activity since her alleged onset date. At steps two and three, the ALJ found that plaintiff had severe impairments (depression and status post-pelvic fracture and post-open reduction/internal fixation of her left wrist), but that her impairments were not severe enough to meet or medically equal any listed impairment. He also found that plaintiff had no past relevant work, but that she had the residual functional capacity ("RFC") to perform the full range of medium work. He therefore found that plaintiff was not disabled. (T. 20-26).

## III. Standard of Review

The Commissioner's decision that plaintiff is not disabled must be affirmed if it is supported by substantial evidence, and the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002); *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Thus, "[i]t is not the function of a reviewing court to decide *de novo* whether a claimant was disabled." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999). "Where the Commissioner's decision rests on adequate findings supported

by evidence having rational probative force[,]" this Court cannot substitute its own judgment for that of the Commissioner. *Veino*, 312 F.3d at 586.

Such a deferential standard, however, is not applied to the Commissioner's conclusions of law. *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984); *accord Tejada*, 167 F.3d at 773. This Court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled. "Failure to apply the correct legal standards is grounds for reversal." *Townley*, 748 F.2d at 112. Therefore, this Court is to first review the legal standards applied, and then, if the standards were correctly applied, consider the substantiality of the evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987); *see also Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) ("'Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.'") (quoting *Johnson*, 817 F.2d at 986).

Here, the Commissioner argues that substantial evidence in the record exists to support the ALJ's determination that plaintiff is not disabled. Plaintiff contends that the ALJ's decision is not supported by substantial evidence, and that the ALJ erred in a number of respects.

**IV. Listing 12.05C**

Plaintiff contends that based on the evidence before him, the ALJ should have found that plaintiff met the criteria of Listing 12.05C, which provides that a claimant will be considered mentally retarded if she can show: "(1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006) (summarizing Listing 12.05(C)).

Consultative psychologist John Thomassen, Ph.D., reported on January 27, 2000 that the results of a Test of Non-Verbal Intelligence, 3rd Edition ("TONI-3"), indicated that plaintiff had an I.Q. of 63, "which places her in the mild range of mental retardation." (T. 545). Apparently Dr. Thomassen administered the TONI-3 because plaintiff's primary language is Spanish, although she can speak, read and write some English. (T. 114). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A § 12.00(D)(6)(d) (stating, with respect to the use of intelligence tests in assessing possible mental retardation, that "[g]enerally, it is preferable to use IQ measures that are wide in scope and include items that test both verbal and performance abilities. However, in special circumstances, such as the assessment of individuals ... whose culture and background are not principally English-speaking, measures such as the Test of Nonverbal Intelligence, Third Edition (TONI-3), ... may be used").

The ALJ gave little if any weight to plaintiff's TONI-3 score, in part because plaintiff is "literate in Spanish" and because, in the ALJ's view, her English skills were relatively good; he noted, for instance, that plaintiff was able to communicate orally in English without an interpreter, that she had lived in the United States for over thirty years, and that she had taken English language classes. (T. 24). He also stated that "the TONI-3 significantly overstates the value of its validity and correlation with the Wechsler Intelligence Scale ... ." He concluded that "there is insufficient reason to use the TONI-3 in the first place, since the claimant does not require a non-verbal test, but can respond to the Spanish Wechsler Adult Intelligence Scale-Revised, if not the English Wechsler Adult Intelligence Scale-Revised." (T. 24).

Plaintiff contends that the ALJ erred in not accepting her 63 score on the TONI-3. I disagree. As stated, the regulations do permit the use of the TONI-3 for individuals who are not fluent in English. The regulations also state that "the results of intelligence tests are only part of the overall assessment," however, to be considered along with other medical evidence, information from the claimant herself, and nonmedical evidence such as evidence of work attempts or information from family members. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A § 12.00(D)(6)(a).

In addition, even Dr. Thomassen recognized that plaintiff's TONI-3 score was of limited value. He stated, for example, that because of the limitations of the TONI-3, plaintiff's "[s]pecific strengths and weaknesses could not be assessed," and that "[i]t is difficult to make conclusions based on this data alone." (T. 545, 546). Although Dr. Thomassen stated that plaintiff's 63 score "places her in the mild range of mental retardation," he concluded, based on his overall examination of plaintiff, that "she functions at about the borderline range of intellectual functioning," (T. 546), which would mean that he believed plaintiff's I.Q. to be between 71 and 84. *See Swope v. Barnhart*, 436 F.3d 1023, 1024 (8th Cir. 2006) ("Borderline intellectual functioning is a condition defined as an IQ score within the 71-84 range while mental retardation is a score of about 70 or below") (quoting *Hutsell v. Massanari*, 259 F.3d 707, 709 n. 3 (8th Cir. 2001)). Dr. Thomassen also opined that "[i]t is likely that there are many jobs for which [plaintiff] might be suited," and that "[h]er prognosis for the future is fairly stable." (T. 546).

The case law and evidence plaintiff relies upon might arguably be consistent with a conclusion that plaintiff is mildly retarded, but they are not *in*consistent with the ALJ's conclusions. They do not show that the ALJ's conclusions are erroneous or that those conclusions are not supported by substantial evidence. For instance, plaintiff cites *Brown v. Secretary of H.H.S.*, 948 F.2d 268 (6th Cir. 1991), in which the Sixth Circuit held that the plaintiff's ability to manage various aspects of everyday living (such as doing his laundry and using public transit) were not inconsistent with a valid I.Q. score of 68, and that the district court erred in rejecting that score in the absence of empirical evidence that it was not valid. The court also recognized, however, that "[t]he regulations do not limit the question of validity to test results alone in isolation from other factors," and that "[i]n assessing the validity of a claimant's I.Q., '[i]nformation from both medical and nonmedical sources may be used ... .'" *Id.* at 269 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)).

Furthermore, it appears that in *Brown*, the ALJ unilaterally decided, without *any* supporting evidence, that the plaintiff's I.Q. score was invalid. Here, as stated, Dr. Thomassen himself indicated that plaintiff's TONI-3 score was not a completely accurate reflection of her intellectual functioning.[1]

Plaintiff also cites the statement of a second consultative examiner, Richard L. Wolfe, Ph.D., that plaintiff's "cognitive functioning is in the borderline range and perhaps below." (T. 535). "Perhaps" is a significant word in that sentence, however. Again, the question before the Court is not whether the ALJ would have been justified in finding that plaintiff is mildly mentally retarded, but whether there is substantial evidence to support his finding that she is not.

There clearly is such evidence. Not only did both Drs. Thomassen and Wolfe conclude that plaintiff probably fell within the borderline (as opposed to mildly retarded) range of intellectual functioning, but their reports note many aspects of her behavior and functioning that provide support for that conclusion. For instance, Dr. Wolfe observed that plaintiff "demonstrated reasonably good grooming and hygiene," that "[h]er expressive language was adequate" and that "[t]here did not appear to be any clear signs of problems with her receptive language," and that her "thought processes were coherent and goal directed with no evidence of confusion, circumstantial thinking or loosening of associations." (T. 534). Dr. Thomassen stated that plaintiff "brushes her teeth daily, washes herself daily, ... is able to do a little cooking," and does some cleaning and laundry. He also opined that she "should be able to follow simple directions and do rote tasks under supervision." (T. 545).[2]

---

[1]Plaintiff also quotes Dr. Thomassen's statement that "[e]xamination results are likely a reliable and valid reflection of [plaintiff's] intellectual capabilities." (T. 545). Read in context, however, it is apparent that Dr. Thomassen was referring not to the results of the TONI-3, but to his overall examination of plaintiff, from which he concluded that she was "at about the borderline range of intellectual functioning."

[2]The reports of plaintiff's treating psychiatrist, Dr. Douglas C. Evans, understandably deal more with plaintiff's psychiatric condition than her intellectual functioning. I note, however, that while those reports do indicate some problems with anxiety and depression, they also indicate that those problems were being successfully managed with the help of medication, that on many of her visits plaintiff seemed to be doing well mentally, and that many of plaintiff's complaints

(continued...)

It is true that both Dr. Wolfe and Dr. Thomassen identified some problems. Dr. Wolfe stated that plaintiff has "a low level of cognitive functioning," (T. 537), and Dr. Thomassen opined that plaintiff "is unlikely to be able to do complex tasks." (T. 545). The salient fact for purposes of this case, however, is that despite these problems, both Drs. Wolfe and Thomassen placed plaintiff within the borderline range of intellectual functioning, meaning that they estimated her I.Q. to be 71 or higher. There is no dispute that plaintiff's intellectual functioning is below average, but nevertheless, there is substantial evidence to support the ALJ's conclusion that she did not meet the standard for mental retardation under Listing 12.05C.[3]

**V. Plaintiff's Residual Functional Capacity**

Since plaintiff had no past relevant work, the burden shifted to the Commissioner to show that a significant number of jobs in the national economy were available to her despite her impairments. *See Markle v. Barnhart*, 324 F.3d 182, 185 (3d Cir. 2003); *Atterberry v. Secretary of H.H.S.*, 871 F.2d 567, 569 (6th Cir. 1989); *Villanueva v. Barnhart*, No. 03 Civ. 9021, 2005 WL 22846, at *8 (S.D.N.Y. Jan. 3, 2005). As stated, the ALJ found that plaintiff had the RFC to perform the full range of medium work. Plaintiff contends that this finding is not supported by substantial evidence.

Plaintiff first asserts that the ALJ ignored evidence of her physical impairments, which mostly stem from injuries suffered in an automobile accident in 1994. The ALJ did recognize, however, that there was some medical evidence that plaintiff suffered from pain in her back and

---

[2](...continued)
were purely physical in nature. *See* T. 295-300, 527-30.

[3]My finding that substantial evidence supports the ALJ's finding that plaintiff does not meet the first prong of Listing 12.05C's standard for mental retardation, *i.e.*, a valid I.Q. score of 60 through 70, makes it unnecessary for me to address plaintiff's contentions that the ALJ also erred in finding that plaintiff did not meet the other criteria of Listing 12.05C, *i.e.*, evidence of mental retardation before age 22, and additional mental and physical impairments amounting to significant work-related limitations of function.

knees. He also noted, though, that on a number of occasions, plaintiff's condition was found to be normal in most or all respects. In addition, even the physicians who noted some physical limitations did not indicate that plaintiff was disabled.

For example, on July 1, 1997, consultative examiner George Sirotenko, M.D., of IMA Disability Services in Rochester, noted that plaintiff reported "chronic back pain," but had normal flexion and range of motion in most respects. He concluded that plaintiff "should be limited to avoiding standing for greater than two hours or walking greater than four city blocks." (T. 366). Similarly, on September 21, 1998, consultative examiner Shehzad Ali, M.D. reported "[f]unctional limits to walking because of back pain," but otherwise the results of his examination were generally normal. (T. 415). He opined that plaintiff's prognosis was "[g]ood if on optimal medical and rehab therapy." *Id.*

On March 30, 1999, consultative examiner Ronald Fine, M.D. reported an impression of "[l]eft wrist pain following internal fixation of the wrist for a previous fracture," and "[c]hronic back pain." (T. 486). He stated that because of the wrist pain, plaintiff had "limited use of the left upper extremity" but that "following a reevaluation and treatment, if necessary, of the left wrist, the claimant should have good use of both hands for fine and gross motor activity." He stated that plaintiff "should not assume awkward postures and is limited to light lifting." *Id.*

On January 27, 2000, consultative examiner Samuel Balderman, M.D. reported that plaintiff complained of back and knee pain since her 1994 automobile accident. (T. 547). He concluded that plaintiff had "minimal limitation in the use of her right upper extremity for reaching," and that there were no limitations in the use of her hands, walking, standing or sitting. He did find a "mild limitation in climbing stairs and bending," and that plaintiff could comfortably lift and carry up to 25 pounds. (T. 549).

A July 1998 report completed by James Sutton, RPA-C, of North Clinton Family Medicine (where plaintiff was a patient) indicated that plaintiff was "moderately limited" in her ability to walk, lift and carry, and climb stairs. (T. 405). Plaintiff's medical records from Clinton Family Health

Center[4] ("CFHC") indicate that in January 1999, her "only complaint [wa]s back pain," for which she was prescribed medication. (T. 459). A record from August 1999 indicates that plaintiff was advised to "avoid strain and heavy lifting," and was prescribed Relafen, a pain reliever. (T. 508).

A CFHC report dated October 12, 1999 indicates that plaintiff was also complaining of pain in her right knee, for which an MRI was ordered. (T. 504). A report by Jani Widjaja, M.D., of Rochester Diagnostic Imaging Associates, states that the results of the MRI, which was performed on October 20, 1999, revealed a "slight increase signal in the anterior ligament likely representing a sprain or a partial tear," as well as a "bone contusion at the anterior aspect of the medial femoral condyle," but "[n]o other bone abnormalities," "[n]o evidence of meniscal tear," and were otherwise "unremarkable." (T. 505). This medical evidence is consistent with the ALJ's conclusion that plaintiff could perform the full range of medium work, subject to the limitations that she not lift or carry more than 25 pounds, and that she perform only "simple tasks and follow[] simple instructions." (T. 26). *See* 20 C.F.R. § 416.967(c).

The ALJ was also entitled to base his conclusion in part on his finding that plaintiff's subjective allegations of pain were not entirely credible. *See Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) ("The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant"); *accord Ianni v. Barnhart*, 403 F.Supp.2d 239, 260 (W.D.N.Y. 2005). "An ALJ's determination with respect to the credibility of witnesses is also given great deference because the ALJ heard the testimony and observed the demeanor of the witnesses." *Ruiz v. Barnhart*, No. 03 Civ. 10128, 2006 WL 1273832, at *7 (S.D.N.Y. May 10, 2006); *see also Centano v. Apfel*, 73 F.Supp.2d 333, 338 (S.D.N.Y. 1999) ("The ALJ's decision to discount plaintiff's subjective complaints of pain must be accepted by a reviewing court unless it is clearly erroneous").

---

[4]It is not clear whether North Clinton Family Medicine and Clinton Family Health Center are the same entity, but plaintiff was a patient at both at different times.

Here, the ALJ set forth several reasons why he found plaintiff to be less than credible. He noted, for example, that plaintiff had told several physicians that she was not currently using drugs or alcohol and that although she had occasionally drunk wine or beer in the past, she had never abused alcohol. (T. 533, 544, 548. Her treating psychiatrist Dr. Evans, however, reported that plaintiff was in a court-ordered treatment program for alcohol abuse, apparently as a result of her stabbing a man after she had been drinking, (T. 39-40, 587-88), and another report from a time when she was hospitalized stated that plaintiff had "a history of alcohol abuse." (T. 431).

In addition, plaintiff claimed to have been hospitalized several times for suicide attempts (T. 531-32, 544), but the record reflected just one such hospitalization (T. 431). The ALJ stated that plaintiff was "vague and evasive as to other attempts," and she later testified that she had not actually attempted suicide on those alleged occasions, but had just thought about it. (T. 22, 44-45, 49). There was also evidence before the ALJ that plaintiff was non-compliant with treatment recommendations and that she often failed to appear for scheduled appointments. (T. 419-20, 589).

On January 8, 2002–nearly two months after the ALJ issued his decision–plaintiff's then-treating physician, Dr. Rafael Cruz, did report that plaintiff had a medial meniscal tear that would probably require surgery, and that plaintiff "cannot work (for now) until [her] knee is repaired." (T. 616).[5] Dr. Cruz did not set forth the basis for his opinion, however, nor did he state when he believed this condition arose. There is no other evidence in the record indicating that plaintiff did have a meniscal tear requiring surgery, or if so when that condition arose, nor is there any evidence as to when Dr. Cruz–whose name does not seem to appear elsewhere in the record–became plaintiff's treating physician.[6]

---

[5]This statement, which was contained in a Medical Examination for Employability Assessment, was submitted to the Appeals Council in plaintiff's January 10, 2002 request for review of the ALJ's decision. (T. 13). The Appeals Council ruled that the matters raised in that request "do not provide a basis for challenging the Administrative Law Judge's decision." (T. 8).

[6]As noted, an October 20, 1999 MRI indicated "[n]o evidence of meniscal tear." (T. 505).

The regulations provide that "if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b); *Toribio v. Barnhart*, No. 02 Civ. 4929, 2003 WL 21415329, at *6 (S.D.N.Y. June 18, 2003). Since Dr. Cruz's report does not indicate that plaintiff's allegedly disabling meniscal tear existed prior to the issuance of the ALJ's decision, the Appeals Council could properly have refused to consider it. *See Toribio*, 2003 WL 21415329, at *7 (opinion evidence in treating physician's report was based on examinations that took place after the ALJ's decision, and Appeals Council therefore did not err in denying review of that decision); *Nichols v. Commissioner of S.S.A.*, 260 F.Supp.2d 1057, 1071 (D.Kan. 2003) (concluding that treating physician's letter, which Appeals Council reviewed but found, without explicit analysis, not to constitute a basis for changing the ALJ's decision, did not relate to the relevant period, and would therefore not be considered by the court).

Furthermore, the Appeals Council would have been justified in rejecting Dr. Cruz's opinion that plaintiff could not work until after she had knee surgery, since that conclusory opinion was inconsistent with the other medical evidence in the record, and was not supported by any test results, or indeed by any stated diagnostic techniques. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (opinion of plaintiff's treating physician is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record"); *see*, *e.g.*, *Spellman v. Shalala*, 1 F.3d 357, 365 (5th Cir. 1993) ("The Appeals Council acted within its discretion in rejecting the treating physician's opinion that Spellman could not perform sedentary work, because Dr. Davis's opinion was inconsistent with the other substantial evidence in the record"); *Morris v. Commissioner of Soc. Sec.*, No. 00-CV-776.2d, 2004 WL 771266, at *6 (N.D.N.Y. Apr. 1, 2004) ("the ALJ properly concluded that the totality of the medical evidence was inconsistent with [the treating physician]'s opinion"); *Nichols*, 260 F.Supp.2d at 1071 ("The opinions contained in [the treating physician's letter] must be discounted as they are too brief and conclusory. Moreover, they are wholly unsupported by any

medical evidence, treatment notes, specific findings, or clinical or diagnostic techniques"); *see also Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (setting forth factors to consider when treating physician's opinion is not given controlling weight, including "the evidence in support of the opinion," and "the opinion's consistency with the record as a whole").

**CONCLUSION**

Defendant's motion for judgment on the pleadings (Dkt. #9) is granted, plaintiff's motion for judgment on the pleadings (Dkt. #12) is denied, and the complaint is dismissed.

IT IS SO ORDERED.

DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
May 30, 2006.